**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

ATLAS STAINLESS
CORPORATION PRIVATE LIMITED,

*Plaintiff,*

and

LAXCON STEELS LIMITED,
OCEAN STEELS PRIVATE LIMITED,
METLAX INTERNATIONAL PRIVATE
LIMITED, PARVATI PRIVATE LIMITED,
and MEGA STEELS PRIVATE LIMITED,

*Consolidated Plaintiffs*,

MELTROLL ENGINEERING PVT. LTD.,
*Plaintiff-Intervenor*,

v.

UNITED STATES,

*Defendant,*

and

CARPENTER TECHNOLOGY
CORPORATION, ELECTRALLOY,
A DIVISION OF G.O. CARLSON,
INC., NORTH AMERICAN STAINLESS,
and VALBRUNA SLATER STAINLESS, INC.,

*Consolidated Defendant-Intervenors.*

Consol. Court No. 26-02192

**ORDER**

Upon consideration of the plaintiffs' Rule 56.2 motion for judgment on the agency record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the plaintiffs' Rule 56.2 motion for judgment on the agency record is denied; and it is further

ORDERED that judgment shall issue for the United States.

Dated: ___________________
New York, New York

_________________________
JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

ATLAS STAINLESS CORPORATION PRIVATE LIMITED,

*Plaintiff,*

and

LAXCON STEELS LIMITED, OCEAN STEELS PRIVATE LIMITED, METLAX INTERNATIONAL PRIVATE LIMITED, PARVATI PRIVATE LIMITED, and MEGA STEELS PRIVATE LIMITED,

*Consolidated Plaintiffs*,

MELTROLL ENGINEERING PVT. LTD.,
*Plaintiff-Intervenor*,

v.

UNITED STATES,

*Defendant,*

and

CARPENTER TECHNOLOGY CORPORATION, ELECTRALLOY, A DIVISION OF G.O. CARLSON, INC., NORTH AMERICAN STAINLESS, and VALBRUNA SLATER STAINLESS, INC.,

*Consolidated Defendant-Intervenors.*

Consol. Court No. 26-02192

PUBLIC VERSION
BPI removed from pp. 10, 12, 15, 16, 18, 19, 21, 22, 23, 25, and 30

**DEFENDANT'S CORRECTED RESPONSE TO**
**PLAINTIFF'S MOTION FOR JUDGMENT UPON AGENCY RECORD**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480 Ben Franklin Station
Washington, D.C. 20044
Tele: (202) 616-2228
Email: Tara.Hogan@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

BRAHIM SLEIMAN
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

October 14, 2026

# TABLE OF CONTENTS

**Page**


STATEMENT PURSUANT TO RULE 56.2 ... 1

I. Administrative Determination Under Review ... 1

II. Issues presented for Review ... 2

STATEMENT OF FACTS ... 2

SUMMARY OF THE ARGUMENT ... 6

ARGUMENT ... 7

I. Standard of Review ... 7

II. Commerce's Determination to Find Atlas to be Affiliated with Hindustan and Sieves Is Supported by Substantial Evidence and Is In Accordance With Law ... 9

III. Commerce's Determination to Collapse Atlas with Hindustan and Sieves Is Supported by Substantial Evidence on the Record and In Accordance With The Law ... 13

A. Legal Standard ... 13

B. Substantial Evidence Supports Commerce's Conclusion That Atlas and Sieves/Hindustan Have Production Facilities for Similar or Identical Products Without Substantial Retooling ... 14

C. Substantial Evidence Supports Commerce's Conclusion That A Significant Potential for the Manipulation of Price or Production Exists Between Atlas, Hindustan and Sieves ... 15

1. Commerce's Finding of Common Ownership Between Atlas and Hindustan/Sieves is Supported by Substantial Evidence ... 16

2. Commerce's Finding of Common Managerial or Directors Between Atlas and Hindustan/Sieves is Supported by Substantial Evidence ... 16

3. Commerce's Finding of Significant Potential for Manipulation of Price or Production is Supported by Substantial Evidence on the Record ... 18

IV. Commerce's Determination to Assign Atlas An Antidumping Duty Rate Based on AFA is Supported By Substantial Evidence and In Accordance With The Law ... 20

A. Legal Standard for Adverse Inferences .................................................. 20

B. Atlas Failed to provide Necessary Information on the Record................. 21

C. Atlas Failed to Cooperate to the Best of its Ability ................................. 22

V. Commerce's Decision to Use the Simple Average of the Two Rates Between Aamor and Atlas to Calculate the Dumping Rate for Non-Selected Companies is Supported by Substantial Evidence and In Accordance With the Law................ 24

A. Legal Framework ........................................................................ 24

B. The Calculation of the "All Others" Rate using the AFA Rate Assigned to Atlas is Supported By Substantial Evidence and In Accordance with the Law ........................................................................................ 25

CONCLUSION......................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albemarle Corp. & Subsidiaries v. United States.*,
821 F.3d 1345 (Fed. Cir. 2016) .......... 24, 26

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) .......... 8

*Bosun Tools Co. v. United States*,
2022 WL 94172 (Fed. Cir. Jan. 10, 2022) .......... 25

*Carpenter Tech. Corp. v. United States*,
510 F.3d 1370 (Fed. Cir. 2007) .......... 13

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007) .......... 8

*Coalition of Am. Millwork Producers v. United States*,
581 F. Supp. 3d 1295 (Ct. Int'l Trade 2022) .......... 16

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) .......... 8

*Downhole Pipe & Equip. LP v. United States*,
776 F.3d 1369 (Fed. Cir. 2015) .......... 11

*Echjay Forgings Private Ltd. v. United States*,
475 F. Supp. 3d 1350 (Ct. Int'l Trade 2020) .......... 14, 19

*Essar Steel Ltd. v. United States*,
721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) .......... 21

*Ferro Union, Inc. v. United States*,
44 F. Supp. 2d 1310 (Ct. Int'l Trade 1999) .......... 9, 11, 12

*Fujitsu Gen. Ltd. v. United States*,
88 F. 3d 1034 (Fed. Cir. 1996) .......... 7

*Goldlink Indus. Co. v. United States*,
431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .......... 8

*Hyundai Elec. & Energy Services v. United States*,
578 F. Supp. 3d 1245 (Ct. Int'l Trade 2022) .......... 17

*Jinko Solar Imp. & Exp. Co. v. United States*,
789 F. Supp. 3d 1275 (Ct. Int'l Trade 2025) .......... 10

*Koenig & Bauer-Albert Ag v. United States*,
90 F. Supp. 2d 1284 (Ct. Int'l Trade 2000) .......... 13

*Kumar Indus. v. United States*,
779 F. Supp. 3d 1329 (Ct. Int'l Trade 2025) .......... 22

*Linyi Chengen Imp. & Exp. Co. v. United States*,
391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) .......... 21

*Nippon Steel Corp. v. United States,*
337 F.3d 1373, 1381 (Fed. Cir. 2003) .......... 20, 21

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) .......... 8, 9

*PAM, S.p.A. v. United States*,
582 F.3d 1336 (Fed. Cir. 2009) .......... 8

*Primesource Building Prods. v. United States*,
111 F.4th 1320 (Fed. Cir. 2024) .......... 27

*Prosperity Tieh Enter. Co. v. United States*,
965 F.3d 1320 (Fed Cir. 2020) .......... 14

*Prosperity Tieh Enterprise Co. v. United States*,
648 F. Supp. 3d 1336 (Ct. Int'l Trade 2023) .......... 11

*Queen's Flowers de Colombia v. United States*,
981 F. Supp. 617 (Ct. Int'l Trade 1997) .......... 13

*Solianus, Inc. v. United States*,
391 F. Supp. 3d 1331 (Ct. Int'l Trade 2019) .......... 25

*Timken Co. v. United States*,
699 F. Supp. 300 (Ct. Int'l Trade 1988) .......... 11

*United States Steel Corp. v. United States*,
179 F. Supp. 3d 1114 (Ct. Int'l Trade 2016) .......... 13, 16, 20

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) .......... 8

*Tung Mung Dev. Co. v. United States*,
25 C.I.T. 752 (2001) .......... 20

*Viraj Group v. United States*,
476 F.3d 1349 (Fed. Cir. 2007) .......... 15, 17

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*,
716 F.3d 1370 (Fed. Cir. 2013) .......... 27

*Zhaoqing New Zhongya Aluminum Co. v. United States*,
70 F. Supp. 3d 1298 (Ct. Int'l Trade 2015) .......... 16

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) .......... 7
19 U.S.C. § 1673(c)(5)(B) .......... 25
19 U.S.C. § 1673d(c)(5) .......... 24
19 U.S.C. § 1673d(c)(5)(A) .......... 24
19 U.S.C. § 1677(33) .......... 9, 14
19 U.S.C. § 1677(33)(A) .......... passim
19 U.S.C. § 1677(33)(A)-(G) .......... 14
19 U.S.C. § 1677(33)(F) .......... passim
19 U.S.C. § 1677e(a)(1)-(2) .......... 20
19 U.S.C. § 1677e(b) .......... 21
19 U.S.C. § 1677m(d) .......... 20
19 U.S.C. § 1677m(e) .......... 21

**Regulations**

19 C.F.R. § 351.401(f) .......... 14
19 C.F.R. § 351.401(f)(1) .......... 14
19 C.F.R. § 351.401(f)(2) .......... 6, 14, 15
19 C.F.R. § 351.401(f)(2)(iii) .......... 18

**Administrative Determinations**

*Antidumping and Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Ser*vice List,
89 Fed. Reg. 7,366 (Dep't of Commerce Feb. 2, 2024) .......... 2

*Antidumping Duties; Countervailing Duties*,
62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997) .......... 16

*Antidumping Duty Orders: Stainless Steel Bar from Brazil, India and Japan*,
60 Fed. Reg. 9,661 (Dep't of Commerce Feb. 21, 1995) .......... 2

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
89 Fed. Reg. 24,780 (Dep't of Commerce Apr. 9, 2024) ........................................ 2, 4

*Stainless Steel Bar from India: Amended Final Results of Antidumping Duty Administrative Review;*, 2018- 2019,
85 Fed. Reg. 86,532 (Dep't of Commerce Dec. 30, 2020) ........................................ 28

*Stainless Steel Bar From India: Final Results and Rescission, in Part, of Antidumping Duty Administrative Review;* 2023-2024,
91 Fed. Reg. 7,442 (Dep't Commerce Feb. 18, 2026) ........................................ 1, 5

*Stainless Steel Bar From India: Preliminary Results and Intent to Rescind, in Part, of Antidumping Duty Administrative Review;* 2023-2024,
90 Fed. Reg. 24,566 (Dep't Commerce June 11, 2025) ........................................ 4

**Other Authorities**

*Statement of Administrative Action accompanying the Uruguay Round Agreements Act*,
H.R. Rep. No. 103-316, Vol. 1 (1994) ........................................ 25

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S MOTION FOR JUDGMENT UPON AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiffs Atlas Stainless Corporation Private Limited (Atlas) and Laxcon Steels Limited *et al.* (Laxcon) challenging portions of the final results of the Department of Commerce's administrative review of the antidumping duty order covering stainless steel bar from India. *See* Atlas's Motion for Judgment on the Agency Record, ECF No. 41 (Atlas Br.); Laxcon's Motion for Judgment on the Agency Record, ECF No. 42. (Laxcon Br). Commerce's determinations to find Atlas to be affiliated and collapsed with Hindustan Inox (Hindustan) and Sieves Manufacturers Private Limited (Sieves), assign Atlas a dumping rate based on total adverse facts available (AFA), and assign a 15.46% dumping margin for "all other" companies are supported by substantial evidence and in accordance with law. Accordingly, we respectfully request that the Court deny the motions, sustain the final results, and enter judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

**I. Administrative Determination Under Review**

Plaintiffs challenge aspects of the final results of Commerce's administrative review of the antidumping duty order covering stainless steel bar from India. *Stainless Steel Bar From India: Final Results and Rescission, in Part, of Antidumping Duty Administrative Review; 2023-2024,* 91 Fed. Reg. 7,442 (Dep't Commerce Feb. 18, 2026) (final results) (P.R. 15)[1], and accompanying Issues and Decision Memorandum (IDM) (P.R.16). The period of review is February 1, 2023, through January 31, 2024.

---

[1] P.R. and C.R. refer to the public and confidential administrative record, respectively.

**II. Issues presented for Review**

1. Whether Commerce's decision to find Atlas to be affiliated with Hindustan and Sieves is supported by substantial evidence and in accordance with law.

2. Whether Commerce's decision to "collapse" (treat as a single entity) Atlas with Hindustan and Sieves is supported by substantial evidence and in accordance with law.

3. Whether Commerce's decision to assign Atlas a dumping duty rate based on adverse facts available (AFA) is supported by substantial evidence and in accordance with law.

4. Whether Commerce's decision to assign a 15.46% dumping margin rate for "all others" companies based on the AFA Atlas dumping margin is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

Commerce has published an antidumping duty order covering stainless steel bar from India. *See Antidumping Duty Orders: Stainless Steel Bar from Brazil, India and Japan*, 60 Fed. Reg. 9,661 (Dep't of Commerce Feb. 21, 1995). On February 2, 2024, Commerce published a notice providing an opportunity to request an administrative review of the order for the period of review. *See Antidumping and Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review and Join Annual Inquiry Service List*, 89 Fed. Reg. 7,366 (Dep't of Commerce Feb. 2, 2024). Based on interested parties' requests, Commerce initiated the administrative review of multiple exporters. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 24,780 (Dep't of Commerce Apr. 9, 2024) (initiation notice) (P.R. 208). In the initiation notice, Commerce explained that, if it limited the number of respondents selected for individual examination, it intended to select

respondents based on U.S. Customs and Border Protection (CBP) import data for the POR. *Id.* at 24,780–81.

Commerce limited the number of exporters selected for individual examination and selected Aamor and Atlas as the mandatory respondents in the administrative review. *See* "Respondent Selection Memorandum" (May 17, 2024) (P.R. 200). Commerce issued its antidumping duty questionnaires to Atlas and Aamor. AD Questionnaire (P.R. 198; 199). Between July and August 2024, Atlas submitted timely responses to Commerce's antidumping duty questionnaire. *See* Atlas' Letters, "Section A Questionnaire response," dated July 9, 2024 (P.R. 169-172); "Section BC&D Questionnaire Response," dated July 29, 2024 (P.R. 139-148).

On July 9, 2024, Atlas, Astrabright, Bahubali Steel, Eurostahl, Venus Metal, Venus Wire, and Precision Metals jointly responded to Section A of Commerce's antidumping duty questionnaire. The response stated that the companies were affiliated through common directorships or common ownership and were engaged in the processing, production, and sale of subject merchandise. *See* Atlas' Letter, "Response to Section A of the questionnaire," dated July 9, 2024 (Atlas AQR).[2] On July 29, 2024, Atlas, Astrabright, Fortis Metals Inc., Venus Metal, Venus Wire, Precision Metals, Eurostahl, and Bahubali jointly responded to other sections of Commerce's questionnaire concerning home-market sales, U.S. sales, and cost of production. *See* Atlas' Letters, "Response to Section BCD of the questionnaire," dated July 29, 2024 (Atlas BCDQR) (P.R.148). The Section B response provided home-market sales information for Atlas, Astrabright, Venus Wire, Precision Metals, Eurostahl, and Bahubali Steel; the Section C response provided U.S. sales information for Atlas and Astrabright; and the Section D response provided cost-of-production information for Atlas, Astrabright, Eurostahl, Venus Wire, and

[2] All Atlas Exhibit AQRs are found at P.R. 169-172.

Precision Metals. Atlas did not include in any of its questionnaire responses information for Hindustan or Sieves. *See* Collapsing Memorandum at 2 (Collapsing Memo) (C.R. 17).

On June 5, 2025, Commerce issued its collapsing memorandum and found that Atlas was affiliated with, and that it should be collapsed with, Hindustan and Sieves. Commerce provided several reasons for this finding. Collapsing Memo at 4-5. Commerce found that the Bohra family owns [ ]% of Hindustan and Sieves. *Id*. (citing Atlas AQR at A-1). Commerce also found that the Sanghvi family owns [ ]% of Atlas. *Id.* at Exhibit A-4. Commerce also found that both families combined own [ ]% of Precision Metals, Venus Metal, Venus Wire, Eurostahl and Bahubali Steel. Collapsing Memo at 4. Commerce then noted that, since 2005-2006, Commerce has treated Precision Metals, Venus Wire, Hundustan, and Sieves as a single entity. *Id.* at 5.

Second, Commerce found that the Bohra and Sanghvi families were affiliated under 19 U.S.C. § 1677(33)(A), which provides that members of a family may be considered affiliated. Commerce found that the families constituted a family group because the record showed a marriage between members of the Sanghvi and Bohra families. Collapsing Memo at 5. Specifically, Prakash C. Sanghvi, a member of the Sanghvi family, is the brother-in-law of Sanjay Bohra. Sanjay Bohra is the son of Motilal Bohra, who is [ ] and the brother of Babulal Bohra, a [ ]. *Id.*

On June 11, 2025, Commerce published the preliminary results of the review. *Stainless Steel Bar From India: Preliminary Results and Intent to Rescind, in Part, of Antidumping Duty Administrative Review; 2023-2024*, 90 Fed. Reg. 24,566 (Dep't Commerce June 11, 2025) (Preliminary Results) (P.R. 55), and accompanying preliminary decision memorandum (PDM) (P.R. 56). Commerce determined that Atlas is affiliated with Astrabright, Bahubali, Eurostahl,

Fortis Metals Inc., Hindustan, Precision Metals, Sieves, Venus Metal, and Venus Wire under 19 U.S.C. § 1677(33)(A). PDM at 5. Additionally, Commerce determined to collapse Atlas with Sieves and Hindustan, based on affiliation, the production facilities and overlap in managers and directors of the three companies. PDM at 5.

Commerce further determined that use of facts available with an adverse inference was warranted because Atlas failed to act to the best of its ability by not providing the information about Hindustan and Sieves that Commerce requested. PDM at 5-9. Commerce assigned Atlas a 30.92 percent dumping duty rate, which is the highest margin applied in any segment of this proceeding. PDM at 9.

Lastly, Commerce preliminarily held that the appropriate rate for the non-examined companies was 15.46 percent, calculated as the simple average of Aamor's 0.00 percent margin and Atlas's 30.92 percent total AFA rate. PDM at 10. Because Atlas's AFA rate rendered its reported data unreliable, Commerce found it could not use Atlas' data for purposes of calculating a weighted-average rate. *Id.* at 9-10.

After consideration of the parties' administrative case briefs, Commerce issued the final results. Commerce continued to find that Atlas was affiliated, and should be collapsed with, Hindustan and Sieves. IDM at 8-10. Additionally, Commerce continued to apply total AFA due to Atlas withholding information requested by Commerce, specifically about cost of production data, and continued to apply a rate of 30.92%. IDM at 7, 10-13. And Commerce continued to use a simple average of the two mandatory respondents' rates as the all others rate. IDM at 16; *Final Results*, 91 Fed. Reg. at 7,443-44.

## SUMMARY OF THE ARGUMENT

The Court should sustain Commerce's finding that Atlas is affiliated with, and should be collapsed with, Hindustan and Sieves. The record establishes that the Bohra family owns [ ]% of Hindustan and Sieves, while the Sanghvi family owns [ ]% of Atlas. Together, the Bohra and Sanghvi families own [ ]% of Precision Metals, Venus Metal, Venus Wire, Eurostahl, and Bahubali Steel. Atlas's own submissions demonstrate that Prakash C. Sanghvi, a member of the Sanghvi family, married into the Bohra family and is the brother-in-law of Sanjay Bohra, a member of the Bohra family. The record also shows a high level of common ownership, overlapping in managers and board members, and intertwined operations among Atlas, Hindustan, and Sieves. Accordingly, substantial evidence supports Commerce's finding that the companies are affiliated under sections 19 U.S.C. § 16771(33)(A) and (F).

Commerce's determination that the affiliated entities should be collapsed should also be sustained. Commerce considered the totality of the circumstances and found a high level of common ownership, overlap in managers and board members, and intertwined operations among Atlas, Hindustan, and Sieves. These facts correspond to the factors identified in 19 C.F.R. § 351.401(f)(2) used to determine whether there exists a significant potential for manipulation of price or production.

Moreover, Commerce's decision to apply total AFA and assign Atlas a 30.92 percent dumping duty rate is supported by substantial evidence and in accordance with law. Commerce repeatedly requested that Atlas provide complete questionnaire responses for all of its affiliates, including Hindustan and Sieves, but the company did not provide the requested information and continued to deny the existence of their affiliation. Atlas withheld information requested by Commerce, failed to provide the information in the requested form and manner, and significantly

impeded the proceeding, warranting the application of facts otherwise available. The missing information included complete sales and cost data, corporate structure and affiliation information, and home market sales to affiliated parties. Because Hindustan and Sieves produced and sold the foreign like product in the home market, and the cost of production data was incomplete, Commerce could not determine which of the home market sales were made below cost or were appropriate for determining normal value. In light of Atlas's repeat failure to provide the requested information and subsequent deficiencies in the record, Commerce determined that Atlas failed to act to the best of its ability. Commerce's application of total AFA was therefore lawful.

Finally, the 15.46 percent dumping margin assigned to the non-selected companies, based on the simple average of the rates assigned to the two mandatory respondents, is supported by substantial evidence and otherwise in accordance with law. Commerce used a simple average because Atlas's unreliable data could not be used to calculate a weighted-average margin based on its ranged public volume data. Further, the all-others rate is representative of the non-examined companies' dumping behavior. Aamor and Atlas, as mandatory respondents, represent a substantial portion of exports of subject merchandise during the POR. This rate is further consistent with margins Commerce calculated in recent segments of this proceeding.

## ARGUMENT

### I. Standard of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.' " *Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C.

§ 1516a(b)(1)(B)(i)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.,* 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" amounts to "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States,* 582 F.3d 1336, 1339 (Fed. Cir. 2009). Substantial evidence is also "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620 (1966).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citation omitted). The Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States,* 501 F.3d 1291, 1296 (Fed. Cir. 2007), and the Court will not substitute its judgment for that of Commerce in choosing between two fairly conflicting views, even though it could justifiably have made a different choice had the matter been before it *de novo*. *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006).

**II. Commerce's Determination to Find Atlas to be Affiliated with Hindustan and Sieves Is Supported by Substantial Evidence and Is In Accordance With Law**

Commerce's determination that Atlas is affiliated with Hindustan and Sieves is supported by substantial evidence and is in accordance with law. Section 771(33) of the Act, 19 U.S.C. § 1677(33), provides several bases for affiliation. These include "{m}embers of a family, including brothers and sisters (whether by the whole or half-blood), spouse, ancestors, and lineal descendants," as well as "{t}wo or more persons directly or indirectly controlling, controlled by, or under common control with, any person." *Id.* § 1677(33)(A), (F). A person is considered to control another person where the person is "legally or operationally in a position to exercise restraint or direction over the other person." *Id.* The statutory definition of control does not require a finding of actual control. Instead, it permits a finding of control where a person or group is in a position to exercise restraint or direction over another person. *Ferro Union, Inc. v. United States,* 44 F. Supp. 2d 1310, 1324 (Ct. Int'l Trade 1999). Commerce may consider "corporate or family groupings" in determining control and that a family may constitute a "person" for purposes of 19 U.S.C. § 1677(33)(F). *Id.* at 1327. Thus, Commerce need not demonstrate that control is actually exercised or that each entity has a direct ownership or management relationship with every other entity. Rather, the relevant inquiry is whether the record establishes the relationships and position of control contemplated by the statute.

The Sanghvi and Bohra families are affiliated under 19 U.S.C. § 1677(33)(A) because of their familial relationship through marriage. The Bohra family owns [ ]% of Hindustan and Sieves, while the Sanghvi family owns [ ]% of Atlas. Collapsing Memorandum at 4. Together, the two families own [ ]% of Precision Metals, Venus Metal, Venus Wire, Eurostahl, and Bahubali Steel. *Id.* The record establishes the marital relationship through Atlas's own Exhibit A-5, which identifies Prakash Sanghvi as a member of the Sanghvi family

and repeatedly identifies him as the "Brother-in-law of Sanjay Bohra," a member of the Bohra family. *See* Atlas' Letter, "Response to Section A of the questionnaire," dated July 9, 2024 (Atlas AQR) at Exhibit A-5 (P.R. 172). Exhibit A-5 also identifies Sanjay Bohra as the son of Motilal Bohra, who is the brother of Babulal Bohra, the director of Venus Wires and partner in Precision Metals. *Id.* Thus, substantial evidence supports Commerce's finding that the Sanghvi and Bohra families are affiliated through marriage.

Atlas argues that the placement of Prakash Sanghvi under the Sanghvi family heading in Exhibit A-5 was inadvertent and that the exhibit does not otherwise identify a relationship between Prakash Sanghvi and the Ghevarchand Sanghvi family. Atlas Br. at 21. Atlas cites statements elsewhere in its submissions asserting that the family owning 99 percent of Atlas has no relationship with the family owning Hindustan and Sieves. *Id.* Commerce is entitled to weigh the record evidence, and determine what evidence is most probative. *Jinko Solar Imp. & Exp. Co. v. United States*, 789 F. Supp. 3d 1275, 1282 (Ct. Int'l Trade 2025). Here, Commerce found that Atlas did not provide sufficient evidence to explain the inconsistency or why other sections of the questionnaire are more accurate. IDM at 7. It was Atlas' burden to do so. Commerce reasonably weighed the information on the record that Atlas provided and found that a familial relationship existed between the Sanghvi and Bohra families and that Sanghvi/Bohra family group owned [ ] percent of and controlled Atlas, Hindustan and Sieves under 19 U.S.C. § 1677(33)(F).

Atlas argues that Commerce erred in treating the Sanghvi and Bohra families as a unified family grouping based on surnames and attributed the ownership interests of those groupings to one another. Atlas Br. at 22–26. Commerce did not rely on the parties' surnames to find a familial relationship. Instead, Commerce relied on the specific relationships identified in Atlas's

Exhibit A-5. Atlas AQR at Ex. A-5; IDM at 6. Atlas's assertion that the Sanghvi and Bohra families are separate does not negate the information Atlas itself reported. Nor does it provide a basis for disregarding that information. To the extent Atlas invites this Court to reweigh the evidence and reach a different conclusion, it may not do so. *Downhole Pipe & Equip. LP v. United States*, 776 F.3d 1369, 1375 (Fed. Cir. 2015); *Timken Co. v. United States,* 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (Court will not "weigh the adequate quality or quantity of the evidence for sufficiency").

Atlas's reliance on *Prosperity Tieh Enterprise Co. v. United States*, 648 F. Supp. 3d 1336, 1346–47 (Ct. Int'l Trade 2023), is misplaced. Atlas Br. at 24-25. In *Prosperity,* the two Lin family companies were competitors, and the record reflected little personal or professional interaction among the relevant family members. *Id.* at 1346–47. The facts on this record are different. Moreover, unlike *Prosperity*, Commerce found that the Sanghvi and Bohra families collectively held majority ownership over multiple companies including Atlas, Hindustan, and Sieves. Collapsing Memorandum at 4; IDM at 7. Thus, Commerce's determination did not rest solely on the existence of familial relations, but on the specific familial relationship established by the record, together with the families' collective ownership interests.

Atlas argues that common ownership and control over another company does not mean that Atlas, Hindustan, or Sieves control each other. Atlas Br. at 17. However, Commerce did not need evidence that Atlas directly controlled Hindustan or Sieves, nor that Hindustan or Sieves directly controlled Atlas. Companies may be affiliated when they are "directly or indirectly controlling, controlled by, or under common control with, any person." 19 U.S.C. § 1677(33)(F). Thus, Commerce may find affiliation when companies are under common control, even if that control is not actually exercised. *Ferro Union,* 44 F. Supp. at 1324. Further,

Commerce may consider family groups when deciding whether companies are under common control. *Id.* at 1326. Here, Commerce found that the Sanghvi and Bohra families, which are connected by marriage, together held majority ownership in Atlas, Hindustan, and Sieves. Collapsing Memorandum at 4; IDM at 7. Those ownership interests placed the families in a position to exercise restraint or direction over the companies. *Id.* Commerce's finding that the companies were under common control is sufficient.

Atlas also argues that Commerce should have treated the relevant individuals as four separate family groups headed by Ghevarchand Sanghvi, Babulal Bohra, Ghevarchand Bohra, and Motilal Bohra. Atlas Br. at 25. Atlas notes that these family members operate separate businesses and claims that they do not influence one another. *Id.* But separate businesses do not erase the family relationships shown in the record. Atlas does not identify evidence showing that those relationships were legally or factually severed. Atlas relies on the alleged [ ] and argues that [ ] show that the families had no common interest. Atlas Br. at 25-26. But a disagreement between family members does not vitiate their family relationships or the ownership interests Commerce identified. This information does not show that the family relationships or ownership interests were terminated or should be disregarded. At most, the evidence shows that certain family members disagreed about a transaction.

The record instead shows the family relationships and ownership interests that Commerce considered. Commerce therefore reasonably considered the Sanghvi and Bohra families together when determining whether the companies were under common control, and Atlas has not shown that Commerce's determination is unsupported by substantial evidence or contrary to law.

Finally, Atlas's contention that the Sanghvi family and each Bohra family must separately share a common interest with every other family member before Commerce may consider their relationships collectively imposes a requirement not found in the statute or in the affiliation analysis. Atlas Br. at 26. As explained above, the record establishes interconnected familial relationships among the relevant individuals, while Commerce also found collective [ ] percent ownership of the companies at issue. Accordingly, Atlas has not demonstrated that Commerce's consideration of the Sanghvi and Bohra families collectively was unsupported by substantial evidence or contrary to law. Commerce's determination that Atlas is affiliated with Hindustan and Sieves should be sustained.

## III. Commerce's Determination to Collapse Atlas with Hindustan and Sieves Is Supported by Substantial Evidence on the Record and In Accordance With The Law

### A. Legal Standard

Collapsing is a practice in antidumping proceedings by which Commerce "determines that affiliated companies should be regarded as one entity, and therefore calculates a single, weighted-average dumping margin to be assessed to the collapsed entity as a whole." *Koenig & Bauer-Albert Ag v. United States,* 90 F. Supp. 2d 1284, 1286 (Ct. Int'l Trade 2000); *see also Carpenter Tech. Corp. v. United States*, 510 F.3d 1370, 1373 (Fed. Cir. 2007). The purpose behind this practice is "to ensure that {Commerce} reviews the entire producer or reseller, not merely a part of it." *Queen's Flowers de Colombia v. United States*, 981 F. Supp. 617, 622 (Ct. Int'l Trade 1997) (citation omitted); *see also United States Steel Corp. v. United States,* 179 F. Supp. 3d 1114, 1135 n.22 (Ct. Int'l Trade 2016) (explaining that "{c}ollapsing entities allows sales of one collapsed entity to be considered sales of the other for purposes of Commerce's dumping margin calculation").

Commerce's rules for collapsing affiliated producers are contained in 19 C.F.R. § 351.401(f). Three conditions must be satisfied for Commerce to collapse "two or more affiliated producers" into a "single entity":

- The companies must be "affiliated," as defined by 19 U.S.C. § 1677(33)(A)-(G).
- The affiliated producers must have "production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities." 19 C.F.R. § 351.401(f)(1).
- There must be "a significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f)(1).

"No one factor is dispositive, but Commerce must consider these factors in light of the totality of circumstances." *Echjay Forgings Private Ltd. v. United States,* 475 F. Supp. 3d 1350, 1360 (Ct. Int'l Trade 2020). Although Commerce need not find all three factors set forth in 19 C.F.R. § 351.401(f)(2) present, collapsing nevertheless requires "a significant potential for manipulation of price, not merely any potential for price manipulation." *Id.* at 1374 (citing *Prosperity Tieh Enter. Co. v. United States,* 965 F.3d 1320, 1323 (Fed Cir. 2020)) (internal quotations omitted). Because Atlas is affiliated with Sieves and Hindustan under 19 U.S.C. § 1677(33), as explained above, the analysis below focuses on the second and third factors.

**B. Substantial Evidence Supports Commerce's Conclusion That Atlas and Sieves/Hindustan Have Production Facilities for Similar or Identical Products Without Substantial Retooling**

Commerce concluded that the second criterion under 19 C.F.R. § 351.401(f)(1) is satisfied because Atlas and its affiliated producers, Sieves and Hindustan, are part of an integrated production structure capable of producing identical subject merchandise without substantial retooling. Section 351.401(f)(1) requires affiliated producers to have "production

facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities." This factor "requires similarity in the products produced, not in the facilities that produce them." *Viraj Group v. United States*, 476 F.3d 1349, 1356 (Fed. Cir. 2007).

Substantial evidence supports the conclusion that the affiliated entities had access to existing facilities capable of producing the same subject merchandise. While Atlas, Astrabright, Bahubali Steel, Eurostahl, Venus Metals, and Venus Wire [

]. *See* Collapsing Memo at 9; Atlas AQR at A-7, A-11; Atlas BCDQR at D-1, D-4 (P.R.1 139-141). Precision Metals is part of the single entity that includes Hindustan and Sieves, which had facilities capable of producing subject merchandise and actually produced and sold that merchandise during the period of review. *See* Atlas AQR at A-12–A-13. Substantial evidence supports Commerce's conclusion that the affiliated entities had existing production capabilities for identical subject merchandise, without any demonstrated need for substantial retooling.

### C. Substantial Evidence Supports Commerce's Conclusion That A Significant Potential for the Manipulation of Price or Production Exists Between Atlas, Hindustan and Sieves

In identifying a significant potential for the manipulation of price or production, Commerce "may consider": (1) "{t}he level of common ownership;" (2) "{t}he extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm;" and (3) "{w}hether operations are intertwined," for example, "through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers." 19 C.F.R.

§ 351.401(f)(2). The decision whether to collapse entities is "fact-specific" and is a "a case-by-case determination." *Coalition of Am. Millwork Producers v. United States*, 581 F. Supp. 3d 1295, 1303 (Ct. Int'l Trade 2022) (citing *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,345-46 Dep't of Commerce May 19, 1997)). "Commerce need not find all of the factors in the regulation present to find a significant potential for manipulation of price or production." *United States Steel*, 179 F. Supp. 3d at 1139. Instead, "{t}hese factors are considered by Commerce in light of the totality of the circumstances," meaning that "no one factor is dispositive." *Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298, 1304 (Ct. Int'l Trade 2015).

**1. Commerce's Finding of Common Ownership Between Atlas and Hindustan/Sieves is Supported by Substantial Evidence**

There exists a significant level of common ownership between the members of the Sanghvi-Bohra family group. As explained above the Sanghvi-Bohra family own [ ] percent of Atlas, Bahubali Steel, Eurostahl, Hindustan, Precision Metals, Sieves, Venus Metals, and Venus Wire. *See* Atlas AQR at Exhibit A-5. Atlas's argument that there is no basis to treat the Sanghvi and Bohra families as a unified family group is unpersuasive. *See* Atlas Br. 27-29. As explained above, the record establishes a familial relationship between the Sanghvi and Bohra families through marriage.

**2. Commerce's Finding of Common Managerial or Directors Between Atlas and Hindustan/Sieves is Supported by Substantial Evidence**

Commerce determined that multiple members of the Sanghvi-Bohra family hold positions as either [ ] of Atlas, Astrabright, Bahubali Steel, Eurostahl, Hindustan, Precision Metals, Sieves, Venus Metals, and Venus Wire. Atlas AQR at Exhibit A-6. For example, members of the Sanghvi family are either [ ], or

[ ]. *Id.* Specifically, [ ] is a director in Atlas and Venus Wire, while [ ] are directors in Atlas, Eurostahl, and Sieves. *Id.* Further, [ ], [ ] are also partners in Precision Metals and [ ] is a partner in Astrabright. *Id.* Similarly, the record establishes that members of the Bohra family are either [ ], or [ ]. *Id.* Specifically, [ ] are directors in Venus Wire and partners in Precision Metals, while [ ] is also a director in Fortis Metals. *Id.* Further, [ ] is a director in Hindustan, as are other [ ]. *Id.*

Atlas's argument that Exhibit A-6 contained an error fails to address the broader record evidence demonstrating managerial overlap among the entities. *See* Atlas Br. at 29. Moreover, the burden of creating an adequate record, including clarifying or reconciling conflicting information, lies with respondents, not with Commerce. *Hyundai Elec. & Energy Services v. United States*, 578 F. Supp. 3d 1245, 1255 (Ct. Int'l Trade 2022).

Although Atlas identifies several subsequent submissions stating that Atlas and Hindustan/Sieves do not share directors, officers, or employees, Atlas does not provide evidence establishing which of its conflicting submissions is accurate or explaining why the information in Exhibit A-6 should be disregarded. And even the other evidence Atlas cites does not establish any error in the relationships identified in Exhibit A-6. Atlas never specifically stated that Prakash Sanghvi is not a member of the Sanghvi family or that it was an error to identify him as one. IDM at 7. Indeed, Prakash Sanghvi is not mentioned at all in Atlas' response to Question 6 of the Section A supplemental questionnaire. Rather, Atlas directs Commerce to Exhibit A-5

of its AQR for further details concerning the Sanghvi family. Atlas Case Br. at 13 (P.R. 26). Atlas subsequently represented, in response to the petitioner's pre-preliminary comments, that it had clarified that Prakash Sanghvi has no relationship with the Sanghvi family. *See* Atlas' Letter, "Atlas Rebuttal Comments," dated May 16, 2025 (Atlas Pre-Prelim Rebuttal Comments) (C.R. 33). Yet, in its pre-preliminary results rebuttal comments, Atlas stated, "There is no record on file to support the petitioner's assumption that Prakash G. Sanghvi is the head of the Sanghvi family, and he is the brother-in-law of the Bohra family." IDM at 7; AQR at Exhibit A-5. Thus, Atlas's own submissions do not logically establish that the information in Exhibit A-6 was erroneous; rather, they introduce further confusion without identifying what specific information was incorrect or why Commerce should disregard Atlas's original submission.

Absent substantiation of Atlas' claimed error, Commerce reasonably relied on the record evidence that Atlas submitted in response to Commerce's questionnaires. Its finding of common managerial and director overlap between Atlas and Hindustan/Sieves is supported by substantial evidence.

**3. Commerce's Finding of Significant Potential for Manipulation of Price or Production is Supported by Substantial Evidence on the Record**

Pursuant to 19 C.F.R. § 351.401(f)(2)(iii), Commerce considers whether affiliated producers' operations are intertwined when determining whether there is significant potential for manipulation of price or production. Relevant indicia include the sharing of sales information, involvement in production or pricing decisions, sharing of facilities or employees, and significant transactions between affiliated producers. *See* Collapsing Memo at 11-12.

Here, substantial evidence supports Commerce's finding of substantial operational interconnections among the entities. Specifically, Atlas, Astrabright, Bahubali Steel, Eurostahl, Precision Metals, Venus Metals, and Venus Wire engaged in related-party transactions involving

purchases of raw materials and sales of finished subject merchandise to one another. *See* Atlas AQR at Exhibits A-7.a, A-7.b, A-7.c, A-7.d, and A-7.e. For example, Atlas, Astrabright, Bahubali Steel, Eurostahl, and Venus Wire sold subject merchandise produced by Precision Metals and also purchased [ ]. *Id*. These transactions demonstrate that the companies' operations were not independent, but instead involved repeated transactions among affiliated entities during the POR. *Id*. The record further demonstrates that several members of the Sanghvi-Bohra family were compensated for their roles and responsibilities at Venus Wire. *See* Atlas AQR at Exhibit A-7.d. Specifically, [ ] was compensated by [ ], while [ ] were compensated as directors of Venus Wire. *See* Atlas AQR at Exhibits A-6 and A-7.d.

Atlas argues that the related-party transactions identified by Commerce do not demonstrate an operational connection between Atlas and Hindustan/Sieves because they involve other affiliated entities. Atlas Br. at 30-31. Atlas's argument, however, isolates individual transactions rather than considering the overall interconnected nature of the entities' operations. Atlas, Hindustan, and Sieves do not operate in isolation; rather, each engages in transactions with the same affiliated entities within the Sanghvi-Bohra family group. Consistent with the requirement to consider the totality of the circumstances, *see Echjay Forgings* 475 F. Supp. 3d at 1360, Commerce considered the entities' overlapping ownership and management, together with their repeated transactions involving the production and sale of subject merchandise. These facts demonstrate that the entities' operations are interconnected, even where particular transactions do not occur directly between Atlas and Hindustan/Sieves. Considering these interconnected

relationships, Commerce reasonably determined that the companies' operations are sufficiently intertwined to establish significant potential for manipulation of price or production.

Substantial evidence supports Commerce's conclusion that Atlas and Hindustan are affiliated, have production facilities for similar or identical products, and maintain significant levels of common ownership and managerial control that create significant potential for price manipulation. Accordingly, Commerce's determination to collapse Atlas with Hindustan/Sieves is supported by substantial evidence on the record and in accordance with the law.

## IV. Commerce's Determination to Assign Atlas An Antidumping Duty Rate Based on AFA is Supported By Substantial Evidence and In Accordance With The Law

### A. Legal Standard for Adverse Inferences

Commerce shall use facts otherwise available to reach its final determination when (1) "necessary information is not available on the record," or (2) a party "withholds information that has been requested," fails to provide such information in a timely way or in the manner requested, "significantly impedes a proceeding," or provides information that Commerce is unable to verify. 19 U.S.C. § 1677e(a)(1)-(2). Where an agency's request is clear and relates to issues in a proceeding, a respondent has a "statutory obligation to prepare an accurate and complete record in response to questions plainly asked by Commerce." *Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752, 758 (2001). "The mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).

Prior to resorting to facts otherwise available, Commerce must inform and provide, where practicable, the noncomplying party with an opportunity to comply. 19 U.S.C. § 1677m(d). If a

party is provided with an opportunity to comply and does so, Commerce may nevertheless "disregard all or part of the original and subsequent responses" if it determines that the information provided is not satisfactory or untimely, subject to 19 U.S.C. § 1677m(e). *Id*.

If Commerce finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," then Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b). When determining whether a respondent has complied to the "best of its ability," Commerce "assess{es} whether {a} respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*, 337 F.3d at 1382.

Adverse inferences are not warranted "merely from a failure to respond," but also in instances when Commerce reasonably expected that "more forthcoming responses should have been made." *Id*. at 1383. Respondents are therefore expected to "be forthcoming with information, regardless of their views on relevancy, in the event the agency finds differently." *Linyi Chengen Imp. & Exp. Co. v. United States*, 391 F. Supp. 3d 1283, 1298 (Ct. Int'l Trade 2019); *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1298-99 (Ct. Int'l Trade 2010) (finding no error in Commerce applying AFA where a party withheld requested information on the basis of its belief that the information was irrelevant and noting the party "nonetheless should have produced {such evidence in} the event that Commerce reached a different conclusion").

**B. <u>Atlas Failed to provide Necessary Information on the Record</u>**

Atlas argues that it provided all information necessary for Commerce to calculate a dumping margin. Atlas Br. at 35-36. Atlas contends that, even if Commerce lawfully collapsed Atlas with Hindustan/Sieves, the record contains sufficient information because all merchandise

Atlas purchased was produced by Atlas and its affiliates, not Hindustan. *Id.* That argument, however, fails to respond to Commerce's reasoning for finding the record deficient: Atlas' failure to provide complete questionnaire responses for Hindustan and Sieves. *See* PDM at 6; IDM at 13.

Information about affiliation is "fundamental" for Commerce to calculate the dumping margin. *Kumar Indus. v. United States*, 779 F. Supp. 3d 1329, 1341 (Ct. Int'l Trade 2025). Here, Atlas itself identified Hindustan and Sieves as companies potentially relevant to the affiliation and collapsing analysis. See Atlas AQR at A-9. Commerce subsequently requested that Atlas have Hindustan and Sieves provide complete Section D responses, on October 21, 2024 and again on December 6, 2024. *See* Commerce's Letter, "Section A Supplemental Questionnaire," dated Oct. 21, 2024, at 2 (C.R. 88); Commerce's Letter, "First Section D Supplemental Questionnaire," dated Dec. 6, 2024 (C.R. 66.) Atlas nevertheless failed to provide those responses.

As in *Kumar*, the missing information was not peripheral, because Hindustan and Sieves produced and sold the foreign like product in the home market. Their sales and cost information was necessary for Commerce to determine which of Atlas's home-market sales were below the cost of production, and which sales could be used to establish normal value. *See Kumar*, 779 F. Supp. 3d at 1340–42. Atlas's failure to submit the requested information about its affiliated companies left a gap in the record from which Commerce was unable to determine normal value or calculate an accurate dumping margin.

### C. <u>Atlas Failed to Cooperate to the Best of its Ability</u>

Commerce's decision to find that Atlas did not act to the best of its ability is supported by substantial evidence. Atlas argues that Commerce failed to justify its finding that Atlas failed to

cooperate to the best of its ability, and merely recited the legal standard for applying adverse inferences. Atlas Br. at 36-38. Atlas then asserts that it did cooperate to the best of its ability by disclosing all its affiliations and providing all details concerning Hindustan and Sieves. *Id*. at 38. In support, Atlas relies on sworn declarations outlining the efforts it undertook. *Id*. at 39; *see also* SDQR at Exhibit SQD-1; *see also* SAQR Q.6 at 2-3 and Exhibits S1-6 and S1-7.

Atlas's argument rests largely on its assertion that it made efforts to obtain information from Hindustan and Sieves. Atlas Br. at 39-40. These efforts, however, did not result in Atlas providing the requested information. Commerce requested complete questionnaire responses for all affiliated companies, including Hindustan and Sieves. *See* Commerce's Letter, "First Section D Supplemental Questionnaire." In response to those requests, Atlas asserted that it was not affiliated with Hindustan and Sieves, and disputed Commerce's determination that the entities should be collapsed with Atlas. Atlas SDQR at 4. Atlas's failure to disclose information relating to its affiliates did not satisfy Commerce's requests for the information necessary to conduct its analysis because it failed to include Hindustan's and Sieves's sales and costs in these disclosures.

Atlas's disclosure of its relationship with Hindustan and Sieves was not a substitute for providing complete questionnaire responses. Commerce identified numerous deficiencies in the record, including: the absence of complete sales information, corporate and affiliation information, organizational charts, information concerning facilities and offices, affiliated-party relationships and transactions, distribution and sales processes, home-market sales to affiliated parties, accounting practices, financial statements, charts of accounts, merchandise and production information, product codes, and a complete sales and cost reconciliation. *See* IDM at 13; *see also* PDM at 6-7.

Atlas cannot credibly rely on an alleged lack of control or leverage to explain its failure to obtain the requested information. Atlas relies on the declaration of its [ ] to substantiate its alleged efforts to obtain information from Hindustan. Atlas Br. at 39. That argument is unpersuasive. As explained above, the Sanghvi-Bohra family has sufficient control to direct its companies to respond to Commerce's requests. Therefore, Atlas' purported efforts did not excuse its failure to obtain the requested information. Similarly, Atlas's assertion that it lacked "leverage" to induce Hindustan/Sieves to comply is inaccurate because the two families wholly own all three companies.

It was within Atlas' ability to supply the requested information and it did not, resulting in information missing from the record in numerous categories of information necessary to perform the dumping analysis. Commerce's determination to apply adverse inferences is supported by substantial evidence on the record and in accordance with law.

## V. Commerce's Decision to Use the Simple Average of the Two Rates Between Aamor and Atlas to Calculate the Dumping Rate for Non-Selected Companies is Supported by Substantial Evidence and In Accordance With the Law

### A. <u>Legal Framework</u>

When Commerce limits its examination to fewer than all companies subject to an administrative review, it must calculate the rate assigned to non-individually examined respondents (the "all-others rate"). While the statute does not specifically provide for the calculation of an all-others rate in a review, Commerce looks to 19 U.S.C. § 1673d(c)(5), which provides the method for determining the estimated all-others rate in an investigation. *See Albemarle Corp. & Subsidiaries v. United States*., 821 F.3d 1345, 1351-53 (Fed. Cir. 2016).

Pursuant to subsection 1673d(c)(5)(A), Commerce calculates the all-others rate by taking a weighted average of the dumping margins for the individually examined respondents,

excluding any margins that are zero, *de minimis*, or determined entirely based on the facts available. When dumping margins for all individually examined companies are zero, *de minimis* or determined based entirely on facts available, Commerce "may use any reasonable method to establish the estimated all-others rate . . . , including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673(c)(5)(B). In such situations, the expected method is to weight-average the zero and *de minimis* margins and the margins determined pursuant to the facts available, provided volume data is available, unless doing so is not feasible or would not be reasonably reflective of potential dumping margins. *See Statement of Administrative Action accompanying the Uruguay Round Agreements* Act, H.R. Rep. No. 103-316, Vol. 1 (1994) (SAA) at 873.

### B. The Calculation of the "All Others" Rate using the AFA Rate Assigned to Atlas is Supported By Substantial Evidence and In Accordance with the Law

Commerce's calculation of the all-others rate by taking a simple average of the two mandatory respondents' rates was a reasonable method and supported by substantial evidence. IDM at 16. Commerce explained why the expected method was not feasible. Because Commerce assigned Atlas an AFA rate, it determined that Atlas's underlying data were unreliable and therefore could not be used to calculate a weighted-average margin based on Atlas's ranged public volume data. IDM at 16-17. Without reliable volume data, Commerce could not apply the expected weighted-average methodology. Commerce therefore exercised its statutory authority to use another reasonable method and calculated the all-others rate by simply averaging Aamor's zero-percent margin and Atlas's 30.92-percent AFA rate. The Federal Circuit has affirmed Commerce's use of a simple average incorporating both zero and AFA rates. *See Bosun Tools Co. v. United States*, 2022 WL 94172, at *4 (Fed. Cir. Jan. 10, 2022); *see also Solianus, Inc. v. United States*, 391 F. Supp. 3d 1331, 1340 (Ct. Int'l Trade 2019)

(sustaining all-others rate calculated as a simple average of mandatory respondents' zero and AFA rates).

Laxcon does not challenge the use of the simple average, but asserts that Atlas's 30.92 percent AFA rate is not representative of the other respondents in this review. Laxcon Br. at 7. The CBP data on the record demonstrate that Aamor and Atlas represented a substantial portion of exports of subject merchandise, by volume, during the POR. *See* Respondent Selection Memo. The largest-volume exporters selected for individual examination are presumed to be representative of all exporters for purposes of calculating the "all-others" rate. *Albemarle Corp. v. United States*, 821 F.3d 1345, 1353 (Fed. Cir. 2016). "The very fact that the statute contemplates using data from the largest volume exporters suggests an assumption that those data can be viewed as representative of all exporters." *Id*. Absent contrary evidence, therefore, their data will "reasonably approximate the margins of all known exporters." *Id*.

Laxcon does not address *Albemarle*'s core holding. Rather, it argues that Commerce contradicted itself by selecting an AFA rate from the 2019-2020 review, relying on *Albemarle*'s statement regarding the "statute's manifest preference for contemporaneity in periodic administrative reviews." Laxcon Br. at 8. In doing so, Laxcon confuses different concepts. The court in *Albemarle* did not address Commerce's selection of AFA rates, nor discourage use of prior rates as AFA rates, as Commerce did here.[3]

Commerce acknowledged the Federal Circuit's statement in *Albemarle* that relying on data from a prior period may be reasonable where "there is evidence that the overall market and the dumping margins have not changed from period to period." IDM at 17 (citing 821 F.3d at

---

[3] Indeed, to the extent that *Albemarle* discussed AFA at all, the court recognized that Commerce "has greater latitude in determining dumping margins when dealing with AFA determination." 821 F.3d at 1357 n.12.

1357). Commerce, however, found no evidence that the overall market had not changed since the 2022-2023 POR. IDM at 17-18.

Laxcon also cites *Bestpak* for the proposition that Commerce must articulate a satisfactory explanation for its calculation of the "all others" rate. Laxcon Br. at 8 (citing *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013)). Specifically, Laxcon argues that the fact that the largest exporter is a mandatory respondent does not, standing alone, establish that its dumping margin is the same as the "all-others" rate. Laxcon Br. at 9. Laxcon further points to differences between the "all-others" respondents and Atlas, including that the former were cooperative respondents while Atlas was assigned an AFA rate. *Id.* These arguments fail for several reasons.

First, *Bestpak* recognized that there is no "legal error" inherent in Commerce's use of a simple average rather than a weighted average. *Id.* at 1378. The problem identified in Bestpak was one of substantial evidence "that the chosen method was reasonable as applied to the facts of that case." *Primesource Building Prods. v. United States*, 111 F.4th 1320, 1331 (Fed. Cir. 2024) (distinguishing *Bestpak*). Here, Commerce explained that the use of simple average was warranted because the data submitted by Atlas was unreliable. *See* IDM 16-17.

Second, the facts here are materially different from those in *Bestpak*. There, the court found that a non-examined company rate of 123.83 percent was "unjustifiably high and may amount to being punitive," based on the facts of that case. *Bestpak*, 716 F.3d at 1378. That statement was based, at least in part, on a "thin record," including the fact that the proceeding was an investigation, with little current or past information about the dumping behavior of the non-examined parties. *Id*. at 1379. Here, by contrast, the non-examined company rate of 15.46 percent is consistent with rates from prior segments of this proceeding. IDM at 18. For instance,

in the 2018-2019 administrative review, Commerce calculated a rate of 16.48 percent for a mandatory respondent. *See Stainless Steel Bar from India: Amended Final Results of Antidumping Duty Administrative Review*; 2018- 2019, 85 Fed. Reg. 86,532 (Dep't of Commerce Dec. 30, 2020).

Thus, the 15.46 percent margin assigned to the non-selected companies is a reasonable reflection of their potential dumping margins during the POR and is supported by substantial evidence and in accordance with law.

**CONCLUSION**

For these reasons, we respectfully request that the Court deny the plaintiffs' motions, sustain Commerce's final results and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Tara K. Hogan
TARA K. HOGAN
United States Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington D.C. 20044
Tele: (202) 616-2228
Email: Tara.Hogan@usdoj.gov

OF COUNSEL:
BRAHIM SLEIMAN
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

October 14, 2026

*Attorneys for Defendant*

CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the word limitation set forth in ¶ 2(B) of the Standard Chambers Procedures because it contains 8,146 words, not including the portions of the brief excluded from the word count limitation.

/s/Tara K. Hogan
TARA K. HOGAN